Terra Nova Insurance Company *v.* Fray-Witzer; Royal & SunAlliance USA.

TERRA NOVA INSURANCE COMPANY *vs.* EVAN FRAY-WITZER & another[1]; ROYAL & SUNALLIANCE USA, third-party defendant.

Suffolk. April 5, 2007. - July 10, 2007.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, & CORDY, JJ.

*Telephone Consumer Protection Act. Advertising. Insurance,* General liability insurance. *Privacy. Words,* "Accident."

In an action seeking a judgment declaring the obligations of the plaintiff and third-party defendant insurers under commercial general liability policies issued to the defendant in the underlying action, a class action alleging violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227 (2000) (TCPA), and G. L. c. 93A and seeking injunctive relief, the judge erred in granting summary judgment in favor of the insurers, where, although the injuries arising from unsolicited facsimile advertisements sent on the defendant's behalf (loss of toner, paper, and use of the recipients' facsimile machines) were inherently probable results of such conduct, and thus were not accidents so as to trigger coverage under the property damage liability provision of the policies [412-414], coverage existed under the advertising injury liability provision of the policies, in that the facsimile advertising campaign constituted the oral or written publication of material within the meaning of that provision, and the allegation that the sending of such a publication violated the recipients' right of privacy stated a covered injury under that provision [414-418]; further, a clause in one of the policies, excluding from coverage advertising injury arising out of the wilful violation of a penal statute, was not applicable, in that the TCPA was a remedial statute intended to address misdeeds suffered by individuals, rather than one that punished public wrongs [418-420], and the provision in the TCPA for the recovery of a monetary amount that could exceed the amount of actual damages was not punitive in nature, so as to trigger a clause in one of the policies excluding coverage for punitive damages [420-421].

CIVIL ACTION commenced in the Superior Court Department on August 4, 2003.

The case was heard by *Allan van Gestel,* J., on motions for summary judgment.

The Supreme Judicial Court granted an application for direct appellate review.

[1]Metropolitan Antiques, LLC.

*John T. Zogby* for Metropolitan Antiques, LLC.

*Matthew P. McCue* (*Edward A. Broderick* with him) for Evan Fray-Witzer.

*John P. Graceffa* (*Fay M. Chen* with him) for the plaintiff.

*Michael F. Aylward* for Royal & SunAlliance USA.

The following submitted briefs for amici curiae:

*Laura A. Foggan & John C. Yang*, of the District of Columbia, *Kim V. Marrkand, & Philip J. Catanzano* for Complex Insurance Claims Litigation Association.

*Brian J. Wanca, Steven A. Smith, & Phillip A. Bock*, of Illinois, for CE Design Ltd.

*Joseph R. Compoli, Jr., & James R. Goodluck*, of Ohio, for Telemarketing, Spam & Junk Fax Litigation Group of the Association of Trial Lawyers of America.

*Charles E. Spevacek & William M. Hart*, of Minnesota, & *Arthur J. McColgan, II*, for St. Paul Fire & Marine Insurance Company & others.

Spina, J. The principal issue we are asked to decide is whether unsolicited facsimile advertisements sent to Massachusetts residents by a New Jersey company, allegedly in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 (2000) (TCPA), caused covered injuries under the terms of two general liability insurance policies.[2] Although we conclude that the facsimile transmissions at issue were not "accidents," for the purposes of insurance coverage, we hold that these advertisements violated their recipients' right of privacy, such that insurance coverage is triggered.

1. *Background.* Metropolitan Antiques, LLC (Metropolitan), is a New Jersey auctioneer services company. After receiving an advertisement, Metropolitan contacted Abdul Syed of Village Fax in Tustin, California, to inquire about facsimile telemarket-

---

[2] We acknowledge the amicus curiae briefs of the Telemarketing, Spam & Junk Fax Litigation Group of the Association of Trial Lawyers of America; CE Design, Ltd.; Complex Insurance Claims Litigation Association; and St. Paul Fire & Marine Insurance Company, Travelers Property Casualty Company of America, American Casualty Company of Reading, PA, Continental Casualty Company, National Fire Insurance Company of Hartford, Transcontinental Insurance Company, Transportation Insurance Company, and Valley Forge Insurance Company.

408 449 Mass. 406 (2007)

Terra Nova Insurance Company *v.* Fray-Witzer; Royal & SunAlliance USA.

ing as a strategy to expand its business in New England. On Syed's referral, Metropolitan purchased a database containing, inter alia, approximately 60,000 Massachusetts facsimile numbers from Fax Marketing, a Florida company. The list of numbers targeted professionals, including doctors, accountants, and attorneys, whom Metropolitan believed would be interested in its services. The database information was transmitted directly to Syed, who began using the numbers to send unsolicited facsimile advertisements on behalf of Metropolitan in the fall of 2001. Syed continued to send such facsimile broadcasts on Metropolitan's behalf every three to four months through March, 2003. He estimates that over this period approximately 360,000 total facsimile advertisements were sent to Massachusetts numbers. Among the recipients of these advertisements were Evan Fray-Witzer and the class of litigants he represents.

In 2003, Fray-Witzer filed a class action complaint in Superior Court against Metropolitan, alleging violations of the TCPA and G. L. c. 93A, and seeking injunctive relief. In 2004, Fray-Witzer filed an amended complaint, adding a new class representative. He also alleged that Metropolitan was negligently responsible for the unsolicited facsimile transmissions and claimed injuries related to the unwanted use of toner, paper, and his facsimile line. Fray-Witzer's class action claim is pending.

During the relevant period, Metropolitan had two different insurance carriers. Between February 9, 2001, and February 9, 2002, Metropolitan was insured under a commercial general liability policy from Royal & SunAlliance USA (Royal). From February 9, 2002, through February 9, 2003, Metropolitan was insured under a commercial general liability policy from Terra Nova Insurance Company (Terra Nova). Both policies contained identical liability coverage for "bodily injury and property damage liability" (Coverage A). Coverage A required the insurer, with some exceptions, to indemnify the insured for amounts it became legally obligated to pay for bodily injury or property damages and gave the insurer the right and duty to defend the insured in an action seeking such damages. In order to be covered, the bodily injury or property damage had to be caused by an "occurrence," which was defined as "an accident, including continuous or repeated exposure to substantially the same

general harmful conditions." The policies likewise contained an exclusion for "bodily injury" or "property damage" expected or intended from the standpoint of the insured.

Both policies also provided coverage for "personal and advertising injury liability" (Coverage B), although the two policies differed in some minor respects. Terra Nova's Coverage B section contained separate definitions for advertising injury[3] and personal injury.[4] The relevant Coverage B section in Royal's policy combined personal and advertising injury into a single definition.[5] Both policies defined the relevant permutation of

---

[3] " 'Advertising injury' means injury arising out of one or more of the following offenses:

"a. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

"b. Oral or written publication of material that violates a person's right of privacy;

"c. Misappropriation advertising ideas or style of doing business; or

"d. Infringement of copyright, title or slogan."

[4] " 'Personal injury' means injury, other than 'bodily injury,' arising out of one or more of the following offenses:

"a. False arrest, detention or imprisonment;

"b. Malicious prosecution;

"c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor;

"d. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

"e. Oral or written publication of material that violates a person's right of privacy."

[5] " 'Personal and advertising injury' means injury, including consequential 'bodily injury,' arising out of one or more of the following offenses:

"a. False arrest, detention or imprisonment;

"b. Malicious prosecution;

"c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor;

injury as "[o]ral or written publication of material that violates a person's right of privacy."

In addition, the Royal Coverage B section contained an exclusion for personal or advertising injury if the insured had knowledge that the act would cause such injury or if the injury arose out of a criminal act.[6] Likewise, the Terra Nova Coverage B section contained a provision intending to exclude wilful violations of a penal statute.[7] Last, the Terra Nova policy alone contained language excluding punitive and exemplary damages.[8]

---

"d. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

"e. Oral or written publication of material that violates a person's right of privacy;

"f. The use of another's advertising idea in your 'advertisement'; or

"g. Infringing upon another's copyright, trade dress or slogan in your 'advertisement.' "

[6]"This insurance does not apply to:

"a. 'Personal and advertising injury':

"(1) Caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict 'personal and advertising injury';

". . .

"(4) Arising out of a criminal act committed by or at the direction of any insured . . . ."

[7]"This insurance does not apply to:

"a. 'Personal injury' or 'advertising injury'

". . .

"(3) Arising out of the willful violation of a penal statute or ordinance committed by or with the consent of the insured . . . ."

[8]"This endorsement modifies insurance provided under:

"Commercial General Liability Coverage Part.

"This insurance does not apply to and no duty to defend is provided for any claim or indemnification for punitive or exemplary damages.

"If a claim or 'suit' shall have been brought against you for a claim within the coverage provided under this policy, seeking both compensa-

Terra Nova initiated the present action against Fray-Witzer and Metropolitan on August 4, 2003, seeking a judgment declaring its obligation to indemnify and defend Metropolitan under its insurance policy. Fray-Witzer subsequently filed a third-party complaint against Royal, requesting a declaration of coverage under Metropolitan's policy. A judge in the Superior Court granted summary judgment in favor of both insurers, concluding that they did not have a duty to defend or indemnify Metropolitan for the injuries alleged in the underlying class action. We granted Fray-Witzer's application for direct appellate review and now reverse the judgment. On appeal, Royal and Terra Nova have filed a joint brief. Metropolitan has adopted the statement of the issue, the statement of the cases and facts, and the argument set forth in Fray-Witzer's brief, while submitting further argument in its own brief. We may refer to the former parties as the insurers and the latter as the class action parties.

2. *Standard of review.* The applicable standard of review requires us to determine "whether, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to a judgment as a matter of law." *Augat, Inc.* v. *Liberty Mut. Ins. Co.,* 410 Mass. 117, 120 (1991). See Mass. R. Civ. P. 56(c), as amended, 436 Mass. 1404 (2002). In so doing, we take all reasonable inferences in favor of the nonmoving party. *Simplex Techs., Inc.* v. *Liberty Mut. Ins. Co.,* 429 Mass. 196, 197 (1999). In this case, there are no material facts in dispute.

3. *Choice of law.* The judge applied the law of New Jersey to this dispute, because Metropolitan is a New Jersey company and the Terra Nova policy was issued there. Such an approach is in accordance with the "various choice-influencing considerations" found appropriate in *Bushkin Assocs.* v. *Raytheon Co.,* 393 Mass. 622, 631-632 (1985). Moreover, the insurers and class action parties agree that there is no relevant difference between New Jersey and Massachusetts law and have both

---

tory and punitive and exemplary damages, then we shall afford a defense for such action. We shall not, however, have any obligation to pay for any costs, interest or damages attributable to punitive or exemplary damages. . . ."

employed New Jersey law in their arguments. In keeping with the judge's appropriate choice of law, we will look to the jurisprudence of New Jersey in interpreting the insurance policy in this case.

4. *Coverage A.* In order to fall within Coverage A of either insurer, the property damage claimed by Fray-Witzer must be caused by an "occurrence," which is defined in both policies as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Thus, the question of law created is whether injuries arising from the unsolicited facsimile advertisements, sent on Metropolitan's behalf, were caused by accidents.

The insurers claim that Metropolitan intended to send the facsimile advertisements, and must reasonably have expected the consequence of causing paper, toner, and facsimile machine time to be used. For that reason, the insurers contend that the property damage complained of was not caused by an accident. In response, the class action parties argue that while Metropolitan may have intended to transmit the advertisements, there was no intent to violate the TCPA. In Fray-Witzer's amended complaint, he alleged that Metropolitan's actions were negligent and not intentional, thus allowing for coverage as "accidental." Further, the class action parties argue that the correct inquiry is not whether the injuring act was intentional, for there is little doubt that Metropolitan intended to send the facsimiles in this case, but rather whether the injury complained of was intentional. Although Metropolitan intended to send facsimiles, the class action parties allege that it was misled by Syed into sending the type of facsimiles that violated the TCPA. Thus, they argue, the injuries incurred, i.e., the receipt of unsolicited facsimile advertisements and the resultant damages, were caused by negligent accidents. We disagree.

In *Voorhees* v. *Preferred Mut. Ins. Co.*, 128 N.J. 165 (1992), the New Jersey Supreme Court considered similar policy language in the context of an infliction of emotional distress claim. The court engaged in a thoughtful public policy analysis before reviewing cases in both New Jersey and foreign courts. *Id.* at 180-183. The court held that "the accidental nature of an occurrence is determined by analyzing whether the alleged

wrongdoer intended or expected to cause an injury." *Id.* at 183. See *Cumberland Mut. Ins. Co.* v. *Murphy*, 183 N.J. 344, 349-350 (2005) (per curiam) (Long, J., concurring); *Harleysville Ins. Cos.* v. *Garrita*, 170 N.J. 223, 234-235 (2001) (adding that courts should refrain from summary judgment based on inferred intent of insured unless record undisputably demonstrates that such injury was inherently probable consequence of insured's conduct); *SL Indus., Inc.* v. *American Motorists Ins. Co.*, 128 N.J. 188, 207 (1992). Thus, the class action parties' proffered concentration on the nature of the injury itself, rather than the injuring act, is correct. However, even when viewed in the light most favorable to the class action parties, the record unquestionably shows that the alleged injury was an inherently probable result of Metropolitan's conduct.

Any sender of a facsimile advertisement knows that his recipient will be forced to consume paper and toner, and will lose temporarily the use of the facsimile transmission line. In this context, the aspect that transforms the transmission into an actionable injury is its unsolicited nature. Yet, Metropolitan knew full well that its facsimile advertisements would reach Massachusetts customers' facsimile machines as unsolicited — it is undisputed that Metropolitan purchased the facsimile database from a third party and provided it to the broadcasting service. Metropolitan knew that these facsimile numbers represented new customers to which it had no previous connection. Indeed, the point of the advertising scheme was to expand Metropolitan's business into a new area by targeting professionals that Metropolitan believed might be interested in its services. It also knew that it had purchased the contact information of approximately 60,000 Massachusetts facsimile owners, without any information whether these people had given consent to be contacted. In light of these facts, it cannot be said that the transmission of unsolicited facsimile advertisements was accidental in nature.

The class action parties' argument amounts to a claim that the failure of Metropolitan's agent to inform it that unsolicited facsimile advertising was a violation of the TCPA somehow transforms the intended injury into an accident. Under the *Voorhees* analysis, the focus is on whether Metropolitan intended or expected to cause the injury in question — i.e., the transmis-

sion of unsolicited facsimile advertisements — not whether the injury in question violated a particular statute. The injuries alleged here do not fall under the provisions of Coverage A because they were not caused by accidents.

5. *Coverage B.* We now turn to the more difficult question whether the injury alleged by Fray-Witzer constitutes an advertising injury under Coverage B of the Terra Nova and Royal policies. The insurers and class action parties agree that the relevant provision of Coverage B applies to "[o]ral or written publication of material that violates a person's right of privacy." The insurers argue first that the alleged injuries were not a result of a publication. Second, the insurers claim that the wording of the policy requires that the content of the publication, rather than the act of sending it, must account for the invasion of privacy. The class action parties respond that the transmission of 60,000 facsimile advertisements to members of the public with whom Metropolitan had no prior relationship constitutes a publication. They further argue that the insurers' claim regarding content would engraft onto the policy a requirement that does not appear on its face.

The principles of interpretation employed by New Jersey courts in the context of insurance policies are laid out in *Voorhees* v. *Preferred Mut. Ins. Co.*, *supra* at 175:

> "Generally, an insurance policy should be interpreted according to its plain and ordinary meaning. *Longobardi* v. *Chubb Ins. Co.*, 121 N.J. 530, 537 . . . (1990). But because insurance policies are adhesion contracts, courts must assume a particularly vigilant role in ensuring their conformity to public policy and principles of fairness. *Sparks* v. *St. Paul Ins. Co.*, 100 N.J. 325, 335 . . . (1985). When the meaning of a phrase is ambiguous, the ambiguity is resolved in favor of the insured, *id.* at 336, and in line with an insured's objectively-reasonable expectations. *DiOrio* v. *New Jersey Mfrs. Ins. Co.*, 79 N.J. 257, 269 (1979)."

It follows that our first inquiry is to address the plain and ordinary meaning of the phrase "[o]ral or written publication of material that violates a person's right of privacy." We do not

believe the word "publication" is ambiguous here. As such, we shall ascribe to it its plain and ordinary meaning: "communication (as of news or information) to the public" or a "public announcement." Webster's Third New Int'l Dictionary 1836 (2002). In this case, the mass transmission of 60,000 facsimile advertisements constitutes the announcement or communication of the material to the public, and we therefore hold that Metropolitan's facsimile advertising campaign, of which Fray-Witzer was a part, satisfied the first phrase of the policy definition of "[o]ral or written publication of material."

Next we must construe the phrase "right of privacy." In interpreting these words, the judge relied entirely on two decisions from the Federal courts of appeals, namely, *Resource Bankshares Corp.* v. *St. Paul Mercury Ins. Co.*, 407 F.3d 631 (4th Cir. 2005), and *American States Ins. Co.* v. *Capital Assocs. of Jackson County, Inc.*, 392 F.3d 939 (7th Cir. 2004).[9] In the *American States* decision, the United States Court of Appeals for the Seventh Circuit noted that the "right of privacy" can be understood to mean either the right to secrecy, such as a person wishing to conceal a criminal conviction or bankruptcy, or a right to seclusion, such as a person asserting a desire to be free from door-to-door sales people ringing the doorbell at night. *Id.* at 941. In the view of the *American States* court, the Coverage B language at issue here pertains only to the right of privacy as that phrase concerns secrecy. *Id.* at 942-943. The court in *Resource Bankshares Corp.* v. *St. Paul Mercury Ins. Co., supra* at 641, relied heavily on the *American States* analysis in interpreting policy language that was different from the language at issue here.[10]

---

[9] We note in passing that the significance of *American States Ins. Co.* v. *Capital Assocs. of Jackson County, Inc.*, 392 F.3d 939 (7th Cir. 2004), was undermined significantly by *Valley Forge Ins. Co.* v. *Swiderski Elecs., Inc.*, 223 Ill. 2d 352 (2006), which was released after the judge made his decision here. The *American States* decision was governed by Illinois law. *American States Ins. Co.* v. *Capital Assocs. of Jackson County, Inc., supra* at 943. The Federal court in that case expressly noted that Illinois had not yet decided this question. *Id.* Since that time, the *Valley Forge* case has been decided by the Illinois Supreme Court, expressly rejecting the formulation of the *American States* decision and reaching the opposite conclusion. *Valley Forge Ins. Co.* v. *Swiderski Elecs., Inc., supra* at 373-379.

[10] The policy at issue in *Resource Bankshares Corp.* v. *St. Paul Mercury Ins.*

As we have seen above, the first step in such an inquiry is to discern the plain and ordinary meaning of the phrase. *Voorhees* v. *Preferred Mut. Ins. Co.*, 128 N.J. 165, 175 (1992). Webster's Third New Int'l Dictionary 1804 (2002) defines "privacy" to mean "the quality or state of being apart from the company or observation of others: seclusion[;] isolation, seclusion, or freedom from unauthorized oversight or observation." Another definition raises the meaning referred to in the *American States* decision, "private or clandestine circumstances: secrecy."[11] *Id.* On its face, the use of the phrase "right of privacy" does not evince a plain meaning that is limited in the manner in which the insurers contend. The lack of such a plain meaning raises the question whether the language is genuinely ambiguous, that is, whether "the phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage." *Weedo* v. *Stone-E-Brick, Inc.*, 81 N.J. 233, 247 (1979).

Although we are aware that "[a]n insurance policy is not ambiguous merely because two conflicting interpretations of it are suggested by the litigants," *Powell* v. *Alemaz, Inc.*, 335 N.J. Super. 33, 44 (2000), in evaluating the ambiguity of the phrase, we cannot ignore the body of national case law addressing the same or similar policy language and falling on both sides of this interpretive ledger.[12] It is fair to say that even the most sophisticated and informed insurance consumer would be

---

*Co.*, 407 F.3d 631, 641 (4th Cir. 2005), was different from the policies here at issue inasmuch as it defined an "advertising injury" as "[m]aking known to any person or organization written or spoken material that violates a person's right of privacy."

[11]Black's Law Dictionary 1350 (8th ed. 2004) defines "right of privacy" as "[t]he right to personal autonomy," or "the right of a person and the person's property to be free from unwarranted public scrutiny or exposure." This definition also references the "invasion of privacy," which the dictionary in turn defines as "[a]n unjustified exploitation of one's personality or intrusion into one's personal activities . . . ." *Id.* at 843. Among the many iterations of "invasion of privacy" are "invasion of privacy by intrusion" and "invasion of privacy by disclosure of private facts." *Id.* The former is defined as "[a]n offensive, intentional interference with a person's seclusion or private affairs." *Id.* The latter is defined as "[t]he public revelation of private information about another in an objectionable manner." *Id.*

[12]Several courts have interpreted identical or similar policy language to mean that unsolicited facsimile advertisements constitute advertising injury: *Park Univ. Enters., Inc.* v. *American Cas. Co. of Reading, PA*, 442 F.3d 1239, 1251 (10th Cir. 2006); *Universal Underwriters Ins. Co.* v. *Lou Fusz Automo-*

confused as to the boundaries of advertising injury coverage in light of the deep difference of opinion symbolized in these cases. Cf. *New Castle County, Del.* v. *National Union Fire Ins. Co. of Pittsburgh, PA*, 243 F.3d 744, 755-756 (3d Cir. 2001) (contemplating continued use of contested terms in insurance contracts). Under applicable law, we hold the term "right of privacy" to be ambiguous in the insurers' policies.

In *Mazilli* v. *Accident & Cas. Ins. Co. of Winterhur, Switzerland*, 35 N.J. 1, 7 (1961), the New Jersey Supreme Court explained the standard for interpreting an ambiguous phrase in an insurance policy: "If the controlling language will support two meanings, one favorable to the insurer and the other favorable to the insured, the interpretation sustaining coverage must be applied. Courts are bound to protect the insured to the full extent that any fair interpretation will allow." Further, "[w]herever possible[,] the phraseology must be liberally construed in favor of the insured; if doubtful, uncertain, or ambiguous, or reasonably susceptible to two interpretations, the construction conferring coverage is to be adopted." *Hunt* v. *Hospital Serv. Plan of N.J.*, 33 N.J. 98, 102 (1960). Accordingly, our view is that Fray-Witzer's allegation of violations of his right of privacy, in the form of statutory infractions under the TCPA, constitute covered injuries under the insurers' policies.

The insurers' reasoning that the content of the material, rather

---

*tive Network, Inc.*, 401 F. 3d 876, 881, 883 (8th Cir. 2005); *American Home Assur. Co.* v. *McLeod USA, Inc.*, 475 F. Supp. 2d 766, 772 (N.D. Ill. 2007); *Hooters of Augusta, Inc.* v. *American Global Ins. Co.*, 272 F. Supp. 2d 1365, 1371-1374 (S.D. Ga. 2003), aff'd by unpublished opinion, 157 Fed. Appx. 201, 208 (11th Cir. 2005); *Western Rim Inv. Advisors, Inc.* v. *Gulf Ins. Co.*, 269 F. Supp. 2d 836, 846-847 (N.D. Tex. 2003), aff'd by unpublished opinion, 96 Fed. Appx. 960 (5th Cir. 2004); *Prime TV, LLC* v. *Travelers Ins. Co.*, 223 F. Supp. 2d 744, 752-753 (M.D.N.C. 2002); *Valley Forge Ins. Co.* v. *Swiderski Elecs., Inc.*, 223 Ill. 2d 352, 369 (2006); *TIG Ins. Co.* v. *Dallas Basketball, Ltd.*, 129 S.W.3d 232, 238-239 (Tex. Ct. App. 2004). There are numerous unpublished decisions to the same effect.

The following cases have reached the opposite conclusion: *Resource Bankshares Corp.* v. *St. Paul Mercury Ins. Co.*, 407 F.3d 631, 641 (4th Cir. 2005); *American States Ins. Co.* v. *Capital Assocs. of Jackson County, Inc.*, 392 F.3d 939, 943 (7th Cir. 2004); *Melrose Hotel Co.* v. *St. Paul Fire & Marine Ins. Co.*, 432 F. Supp. 2d 488, 503 (E.D. Pa. 2006); *St. Paul Fire & Marine Ins. Co.* v. *Brunswick Corp.*, 405 F. Supp. 2d 890, 895 (N.D. Ill. 2005).

than its mere existence, must violate the right of privacy is unpersuasive. In effect, the insurers argue that the policy's definition of injury should be read to say "[o]ral or written publication of material, *the content of which* violates a person's right of privacy." But New Jersey law is clear that when construing an ambiguous phrase in an insurance policy, courts should "consider whether clearer draftsmanship by the insurer 'would have put the matter beyond reasonable question.' " *Progressive Ins. Co.* v. *Hurley*, 166 N.J. 260, 274 (2001), quoting *Doto* v. *Russo*, 140 N.J. 544, 557 (1995). In other words, had Terra Nova and Royal wished their policies to pertain only to violations of privacy created by the content of material, it was incumbent on them to draft explicit policies to that effect.[13]

6. *Exclusions*. The insurers raise two possible exclusions contained in their policies as grounds for denying coverage.

First, Terra Nova's policy contains an exclusion that removes from coverage " '[p]ersonal injury' or 'advertising injury' . . . [a]rising out of the willful violation of a penal statute or ordinance committed by or with the consent of the insured . . . ."[14] See note 7, *supra*. The insurers argue that the TCPA is a penal statute because its statutory damages clause is punitive in nature, rather than compensatory. In response, the class action parties argue that the manifest purpose of the TCPA is remedial and it therefore cannot be deemed a penal statute.

New Jersey courts have not yet ruled whether the TCPA

---

[13]We are likewise unpersuaded by the insurers' reliance on the context of the relevant policy language to argue that content must be the cause of the injury. The insurers point to the content-based violations found in the neighboring clauses of the advertising and personal injury definitions, i.e., slander, libel, misappropriation, and copyright infringement. This claim overlooks the additional clause, found in Royal's "[p]ersonal and advertising injury" definition and in Terra Nova's "[p]ersonal injury" definition along with the language here at issue, see notes 4 and 5, *supra*, allowing coverage for injury caused by "[t]he wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor." The inclusion of this definition, juxtaposed with the relevant injury definition, undermines the insurers' argument that content-based violations alone, and not intrusions on seclusion, are included in the policies.

[14]Royal's policy contains a somewhat similar exclusion, denying coverage if the insured had actual knowledge that he was causing advertising or personal injury or if the injury arose from a criminal act. See note 6, *supra*.

is a penal statute. "A penal statute is one which imposes punishment for an offense against the [S]tate as compared to a wrong against an individual." *Abbott* v. *Drs. Ridgik, Steinberg & Assocs., P.A.*, 609 F. Supp. 1216, 1218 (D.N.J. 1985), citing *Ryan* v. *Motor Credit Co.*, 130 N.J. Eq. 531 (1942). Cf. *State* v. *Widmaier*, 157 N.J. 475, 493 (1999) (reciting seven-factor test in determining that law regarding refusal to take breathalyzer test was quasi criminal in nature such that double jeopardy principle attached). Congress spoke clearly on the animating purpose of the TCPA's facsimile advertising provisions, noting that a restriction was needed to prevent advertisers from unfairly shifting the cost of their advertisements to consumers while simultaneously preventing the use of their facsimile machine for legitimate purposes. See H.R. Rep. No. 102-317, 102d Cong., 1st Sess., at 10 (1991).[15] The aggrieved facsimile recipient is provided with a private right of action allowing for an injunction and recovery of actual monetary loss, or $500 in statutory damages for each such violation, whichever is greater. 47 U.S.C. § 227(b)(3).[16] In addition, the statute provides for treble damages if a judge finds that the defendant wilfully or knowingly violated its terms. *Id.*

---

[15] "Facsimile machines are designed to accept, process, and print all messages which arrive over their dedicated lines. The [facsimile] advertiser takes advantage of this basic design by sending advertisements to available [facsimile] numbers, knowing that it will be received and printed by the recipient's machine. This type of telemarketing is problematic for two reasons. First, it shifts some of the costs of advertising from the sender to the recipient. Second, it occupies the recipient's facsimile machine so that it is unavailable for legitimate business messages while processing and printing the junk [facsimile]." H.R. Rep. No. 102-317, 102d Cong., 1st Sess., at 10 (1991).

[16] "(3) Private right of action. A person or entity may, if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State —

"(A) an action based on a violation of this subsection or the regulations prescribed under this subsection to enjoin such violation,

"(B) an action to recover for actual monetary loss from such a violation, or to receive up to $500 in damages for each such violation, whichever is greater, or

"(C) both such actions."

47 U.S.C. § 227(b)(3). It also should be noted that both State officials and the Federal Communications Commission are vested with statutory authority to

We conclude that these characteristics define the TCPA as a remedial statute intended to address misdeeds suffered by individuals, rather than one that punishes public wrongs. The purpose of the statute is to protect facsimile machine owners from unsolicited advertisements. The statutory damage remedy flows directly to the private consumer who suffered the injury, rather than to the government. It is true, of course, that the statutory damages amount allows for damages that could be somewhat greater than the actual harm suffered, depending on the circumstances of the violation. See *Kaplan* v. *Democrat & Chronicle*, 266 A.D.2d 848, 849 (N.Y. 1999) (finding that TCPA does not require plaintiff to prove actual monetary loss because statutory damages are punitive in nature). This aspect alone, however, does not transform the TCPA into a penal statute. See *Hooters of Augusta, Inc.* v. *American Global Ins. Co.*, 272 F. Supp. 2d 1365, 1375-1376 (S.D. Ga. 2003), aff'd by unpublished opinion, 157 Fed. Appx. 201, 208 (11th Cir. 2005); *Western Rim Inv. Advisors, Inc.* v. *Gulf Ins. Co.*, 269 F. Supp. 2d 836, 848-849 (N.D. Tex. 2003), aff'd by unpublished opinion, 96 Fed. Appx. 960 (5th Cir. 2004). Such a finding would ignore the basic nature of the penal statute definition and be in conflict with New Jersey's mandate to interpret insurance policies liberally in favor of the insured. See *Hunt* v. *Hospital Serv. Plan of N.J.*, 33 N.J. 98, 102 (1960).

The second set of exclusionary language involves Terra Nova's punitive damages endorsement. The Terra Nova policy expressly provides that the policy "does not apply to and no duty to defend is provided for any claim or indemnification for punitive or exemplary damages." See note 8, *supra*. Terra Nova, interpreting the plaintiff's request of statutory damages under 47 U.S.C. § 227(b)(3) as punitive in nature, seeks to apply this language to bar coverage. The damages provision contained in the TCPA provides for recovery of "actual monetary loss from such a violation, or . . . up to $500 in damages for each such violation, whichever is greater." 47 U.S.C. § 227(b)(3)(B). Such a provision allows for the recovery of a monetary amount that could exceed the amount of actual

enforce the TCPA on behalf of consumers through civil proceedings in Federal courts. See 47 U.S.C. § 227(f).

damages. However, the insurers have offered little evidence to show that Congress intended this provision to be punitive in nature.[17] As with countless other statutes, the TCPA's damages provision serves to "liquidate uncertain actual damages and to encourage victims to bring suit to redress violations." *Universal Underwriters Ins. Co.* v. *Lou Fusz Automotive Network, Inc.*, 300 F. Supp. 2d 888, 893 (E.D. Mo. 2004), quoting *Mourning* v. *Family Publ. Serv., Inc.*, 411 U.S. 356, 376 (1973). Such aims do not necessarily punish the offending advertisers so much as ensure that consumers do not refrain from bringing suit to protect their statutory rights because their damages are difficult to quantify. The statutory provision allowing for recovery of the greater of the actual monetary loss or $500 to compensate consumers for difficult to quantify business interruption losses does not amount to punitive damages. On the other hand, if the court, in its discretion, were to increase the amount of damages above $500 per violation, pursuant to the allowance of treble damages under 47 U.S.C. § 227(b)(3), such an increase would amount to punitive damages and would not be covered under Terra Nova's policy. See *Liberty Mut. Ins. Co.* v. *Land*, 186 N.J. 163, 185 (2006) (Albin, J., dissenting), and cases cited.

7. *Conclusion.* For the foregoing reasons, the judgment of the Superior Court is reversed. The case is remanded for entry of a declaration that Terra Nova and Royal have a duty to defend and indemnify Metropolitan in the underlying class action under the terms of their insurance policies.

*So ordered.*

---

[17]In support of their argument, the insurers cite *Kaplan* v. *Democrat & Chronicle*, 266 A.D.2d 848, 849 (N.Y. 1999), as well as *Kaufman* v. *ACS Sys., Inc.*, 110 Cal. App. 4th 886, 921-923 (2003), and *ESI Ergonomics Solutions, LLC* v. *United Artists Theater Circuit, Inc.*, 203 Ariz. 94, 100 (Ct. App. 2002). The cited section of the *Kaufman* decision addresses whether the TCPA's damages section violates due process by awarding disproportionate damages. The relevant portion of the *ESI* decision overturned a lower court's denial of class certification on the basis of "annihilating" damages. Although the cited cases state that the TCPA was meant to deter the prohibited practice of unsolicited facsimiles, they do not cite evidence of congressional intent that the statutory damages provision be punitive.