Kaplan, Mitchell H., J.
INTRODUCTION
This action arises out of a coverage dispute between the plaintiff insurance companies, Holyoke Mutual Insurance Company in Salem (Holyoke) and Maryland Casually Company (Maryland) (individually, an Insurer and collectively, the Insurers) and the defendant, Vibram USA, Inc.[1] Each of the Insurers issued commercial general liability policies (the Policies) to Vibram during the relevant period that provided, among other things, coverage for losses from “advertising injury liability.” Each of the Policies also provided that the Insurer has the duty to defend an insured from any suit seeking damages for losses covered by the policy, but not for losses to which the insurance does not apply. Vibram is a defendant in an action pending in the United States District Court for the Western District of Washington at Tacoma captioned: Tefere Abebe Bikila, and others v. Vibram, case no. 3:15-cv-05082-RBL (the Underlying Action). Vibram tendered the defense of the Underlying Action to the Insurers. They denied coverage and brought this declaratory judgment action seeking a declaration that the claims asserted against Vibram in the Underlying Action are not covered under the Policies; Vibram counterclaimed for a declaration that they are. The case is now before the court on the Insurers’ motion for summary judgment declaring that the claims are not covered, and Vibram’s cross motion for partial summary judgment declaring that the Insurers have a duly to defend Vibram in the Underlying Action. For the reasons that follow, the Insurers’ motion is ALLOWED and Vibram’s motion is DENIED.
BACKGROUND
The parties agree that the court need not address the Policy periods of the six policies at issue, or any issues of primary and secondary coverage between the Insurers, to resolve the pending motions; nor are the monetary limits of coverage for indemnity or defense costs at issue. They also agree that the interpretation of the Policies is governed by Massachusetts law. Finally, the Insurers have filed a joint motion for summary judgment and the relevant language of the Policies may be considered identical for the purposes of these motions.
The Policies
Each of the Policies provides coverage for “sums that the insured becomes legally obligated to pay as damages because of ‘personal and advertising injury.’ ” They also provide that the Insurers “have the right and duty to defend the insured against any ‘suit’ seeking those damages. However, [they] . . . have no duly to defend the insured against any ‘suit’ seeking damages for ‘personal and advertising injury’ to which this insurance does not apply.”
As relevant to this case, “personal and advertising injury”[2] means:
e. Oral or written publication, in any manner, of material that violates a person’s right of privacy,
f. The use of another’s advertising idea in your “advertisement,” or
g. Infringing upon another’s copyright, trade dress or slogan in your “advertisement.”
The Policies also include the following exclusion:
This insurance does not apply to:
“Personal and advertising injury” arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another’s advertising idea in your “advertisement.” However, this exclusion does not apply to infringement, in your “advertisement,” of copyright, trade dress or slogan.
The Underlying Action
The Second Amended Complaint in the Underlying Action, which is presently the operative complaint (the complaint), alleges that the plaintiffs are, generally stated, the living heirs of Abebe Bikila. It goes on to allege how Abebe Bikila came to win the 1960 Olympic marathon running barefoot, then won the race again in the 1964 Olympics, and died in 1973 as the result of an automobile accident. The Complaint alleges that Vibram applied for and received a registered trade *566 mark for Bikila Footwear and has used this trademark to sell shoes and running wear; in particular, its “minimalist FiveFingers . . . line of running shoes.”
According to the complaint, the plaintiff heirs of Abebe Bikila, referred to as the Bikila Family, own the “intellectual properly” associated with the Bikila name and, since Abebe’s death, have “sought to protect Abebe Bikila’s personality rights and intellectual property from any unauthorized use for commercial purposes. Additionally, by their commercial uses, sponsorship and promotion of historical and educational events, and multimedia events emphasizing the cultural and athletic legacy of Abebe Bikila, the Bikila Family has intentionally associated their family name with Abebe Bikila’s barefoot dedication to succeed under any circumstances.”
The complaint also identifies the instances in which the Bikila Family have used or authorized the use of the name Abebe Bikila. From 1980 to 1990, the Bikila Family operated a sporting goods store in Ethiopia named after Abebe Bikila. His son published the book, Triumph and tragedy: A history of Abebe Bikila and his marathon career (1996). In 2007, Abebe Bikila was featured in a Japanese commercial with the permission of the family. (The product being promoted is not alleged.) In 2009, a movie that focused on the final years of Abebe Bikila’s life was released. Since 2010, the Bikila Family have operated a website that provides information on the life and legacy of Abebe Bikila and the annual Abebe Bikila International Marathon in Addis Ababa, which the Bikila Family sponsors.
The complaint is pled in four counts. The first claim is for a violation of the Washington Personality Rights Act, RCW 63.60 et seq. Here, the Bikila Family avers that Abebe Bikila is a deceased personality within the meaning of the Act and they own his personality rights, which Vibram has infringed. The second claim asserts that Vibram engaged in an unfair or deceptive act or practice in violation of the Washington Consumer Protection Act, RCW §19.86.020. The third claim is for false designation and Federal unfair competition in violation of 15 U.S.C. §1125(a). In essence, the Bikili Family avers that Vibram has sought to capitalize on the goodwill and recognition associated with the Bikila name, by falsing suggesting that the Bikila Family endorsed or sponsored the association of Abebe Bikila’s name with Vibram’s running shoes and apparel. The fourth claim alleges that Vibram has been unjustly enriched by its unauthorized use of the name and should pay to the Bikila family profits earned through its commercial use.
DISCUSSION
The rules governing the interpretation of an insurance policy and the duty to defend an insured under Massachusetts law have been well established for many years and are not in dispute.
As a general rule, the policyholder bears the initial burden of proving coverage within the policy description of covered risks. Markline Co. v. Travelers Ins. Co., 384 Mass. 139, 140 (1981). Once basic risk coverage is established, the burden shifts to the insurer to prove the applicability of any exclusion to coverage set forth outside of the insuring clause. See Murray v. Continental Ins. Co., 313 Mass. 557, 563 (1943); Ratner v. Canadian Universal Ins. Co., 359 Mass. 375, 381 (1971). The fact that [the insured] sought declaratory relief does not alter the defendant’s burden of proof. Stop & Shop, Inc. v. Ganem, 347 Mass. 697, 703 (1964). Ranger Ins. Co. v. Air-Speed, Inc., 9 Mass.App.Ct. 403, 406 n.9 (1980).
“It is settled in this jurisdiction, and generally elsewhere, that the question of the initial duty of a liability insurer to defend third-party actions against the insured is decided by matching the third-party complaint with the policy provisions . . .” Sterilite Corp. v. Continental Cas. Co., 17 Mass.App.Ct. 316, 318 (1983). If the allegations of that complaint can be reasonably read to “state or adumbrate[3] a claim covered by the policy terms,” the insurer is obligated to defend. Id. See Continental Cas. Co. v. Gilbane Bldg. Co., 391 Mass. 143, 146-47 (1984); Terrio v. McDonough, 16 Mass.App.Ct. 163, 166, (1983). In order to give rise to the duty to defend, the underlying complaint need show only a possibility of coverage. Sterilite Corp. v. Continental Cas. Co., supra 17 Mass.App.Ct. at 319.
[[Image here]]
Interpretation of the language of [an insurance policy] presents a question of law. Save-Mor Supermarkets, Inc. v. Skelly Detective Serv., Inc., 359 Mass. 221, 226, (1971). In this interpretation, we are guided by three fundamental principles: (1) an insurance contract, like other contracts, is to be construed according to the fair and reasonable meaning of its words, Cody v. Connecticut Gen. Life Ins. Co., 387 Mass. 142, 146 (1982); (2) exclusionary clauses must be strictly construed against the insurer so as not to defeat any intended coverage or diminish the protection purchased by the insured, Vappi & Co. v. Aetna Cas. & Sur. Co., 348 Mass. 427, 431-32 (1965); Bates v. John Hancock Mut. Life Ins. Co., 6 Mass.App.Ct. 823 (1978); Sterilite Corp. v. Continental Cas. Co., 17 Mass.App.Ct. at 321 n.10; and (3) doubts created by any ambiguous words or provisions are to be resolved against the insurer, Cody v. Connecticut Gen. Life Ins. Co., supra, 387 Mass. at 146; Bates v. John Hancock Mut. Life Ins. Co., supra.
Camp Dresser & McKee, Inc. v. Home Ins. Co., 30 Mass.App.Ct. 318, 321-24 (1991). More specifically, with respect to the issue of putatively ambiguous policy terms, an ambiguity exists when “there are two rational interpretations of policy language.” See Hazen Paper Co. v. United States Fidelity & Guaranty Co., 407 *567 Mass. 689, 700 (1990). In that case, the court should “consider what an objectively reasonable insured, reading the relevant policy language, would expect to be covered.” Id.
In determining whether the allegations in a complaint make out a claim within the coverage of a policy, “the process is not one of looking at the legal theory enunciated by the pleader but of envisaging what kinds of losses may be proved as lying with the range of the allegations of the complaint, and then seeing whether any such loss fits the expectation of protective insurance reasonably generated by the terms of the policy.” Billings v. Commerce Ins. Co., 458 Mass. at 201. Internal citations and quotations omitted.)
With these principles in mind, the court turns to the policy language and the factual allegations of the Underlying Action. Vibram argues that a duty to defend arises under the clauses e, f, and g of the definition of “advertising injury” quoted above from the Policies. The defendant argues that none of these definitions apply to the allegations of the Underlying Action, and even if a “right to privacy” applied to claims asserted in the Underlying Action, coverage would still be absent because of the exclusion for claims asserting infringement of intellectual property rights. The court will consider each of the definitions in the order that they appear in the policy and also the exclusion.
Oral or written publication, in any manner, of material that violates a person’s right of privacy.
The term “privacy” is not defined in the Policies. Vibram directs the court to a number of coverage cases in which the question raised was whether commercial insurance policies which provided coverage for advertising injury arising out of a violation of a right of privacy covered claims brought under the Telephone Consumer Protection Act, 47 U.S.C., §227 (2000) (TCPA), for sending unsolicited faxes to potential customers for business purposes. See Terra Nova Ins. Co. v. Fray-Witzer, 449 Mass. 406, 416-17 n. 11 and n. 12 (2007). In Terra Nova, the Supreme Judicial Court (SJC) reflected on the number of decisions that had been issued by diverse courts on both sides of this coverage question. It then held that continued use of a policy term that had been the subject of so much litigation with inconsistent holdings would cause “even the most sophisticated and informed insurance consumer [to be] confused as to the boundaries of advertising injury coverage in light of the deep difference of opinion symbolized in these cases.” Id. The fact that the application of the “right of privacy” to the fax cases was subject to confusion and contest does not mean that this term is ambiguous when applied to all claims, and, in particular, a claim for unauthorized use of a celebrity’s name to promote a product.
For its part, Vibram did not direct the court to any case in which the unauthorized use of a person’s name for commercial purposes was held to constitute a violation of a right of privacy.[4] In Zacchini v. Scripps-Howard Broadcasting Co., 433 U.S. 562, 573 (1977), the United States Supreme Court explained that Dean Prosser had included the “right of publicity” as one of the “four distinct branches” of privacy law. The Supreme Court then, however, went on to explain that violations of the common-law “right of publicity” were claims for infringement of a proprietary interest “closely analogous to the goals of patent and copyright law,” very different from torts arising out of a violation of personal rights. Id.
More fundamentally, for purposes of interpreting these insurance policies, in Massachusetts the right of privacy and the right to publicity have been governed by two distinct statutes for many years. In 1973, the Legislature enacted G.L.c. 214, §3A which is entitled “Unauthorized Use of Name, Portrait or Picture of Person” and provides a civil action for using, among other things, a person’s name “for advertising purposes or for the purposes of trade without his written consent.” In Tropeano v. Atlantic Monthly Co., 379 Mass. 745 (1980), the SJC expressly stated that this statute must be construed to protect rights distinct from those protected by G.L.c. 214, §1B, which is entitled “Right of Privacy” and provides a claim for “unreasonably, substantial or serious interference with [a person’s] privacy,” so that G.L.c. 214, §3A, will “perform its intended function without overlapping the function of the Right of Privacy statute.” Id, at 748. In consequence, the difference between the “Right of Privacy” and the “Right of Publicity” and what each of these rights protects has been well defined in Massachusetts for several decades.
In Terra Nova, the SJC stated that the first step in construing a term in an insurance policy “is to discern the plain and ordinary meaning of the phrase.” 449 Mass, at 416. It then went on to quote Webster’s Third New Int’l Dictionary 1804 (2002) definition of privacy: “the quality or state of being apart from the company or observation of others: seclusion!;] isolation, seclusion, or freedom from unauthorized oversight or observation.” Id. It also quoted from Black’s Law Dictionary 1350 (8th ed. 2004) which defines “right of privacy” as “(t]he right to personal autonomy,” or the right of a person and the person’s property to be free from unwarranted public scrutiny or exposure." Id. at n.ll. Neither of those definitions suggests that the common meaning of the term “right of privacy” includes the unauthorized, commercial use of a famous person’s name.
The Underlying Action never mentions the phrase “right of privacy” or anything akin to it. That is not in itself determinative, as the coverage issue is resolved by looking for “what kinds of losses may be proved as lying with the range of the allegations of the complaint.” Billings v. Commerce Ins. Co., 458 Mass. at 201. Such a search, however, demonstrates that the kinds of losses alleged in the Underlying Action are losses like those arising out of an infringement of the *568 right of publicity expressly defined by statute in Massachusetts and analogous to the goals of copyright and trademark law, as described by the United States Supreme Court in Zacchinl[5] These losses are not like those personal injuries that arise from a violation of the right of privacy, as defined in dictionaries. Vibram’s suggestion that the right to publicity is synonymous with the term “privacy” as used in the Policies is not a reasonable interpretation.
Exclusion for “ ‘Personal and advertising injury’ arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights”
Although Vibram did not direct the court to any case in which a right to publicity was found to give rise to coverage as an “advertising injury” under a commercial insurance policy, the Insurers did. In Aroa Marketing, Inc. v. Harford Ins. Co. of the Midwest, 198 Cal.App. 4th 781 (2011), a model filed suit against Aroa for the unauthorized use of her image and likeness to sell products without compensating her. Aroa tendered the defense of the claim to its insurer, which denied coverage, and Aroa then filed this coverage action. The appellate court (California Second District, Division 4) found that the California Supreme Court had held that the right of publicity had historically been grouped by Dean Prosser under the “privacy rubric” and “no California case [had rejected] this historical grouping.” Id. at 787. It therefore held that the underlying publicity claim was within the “privacy” prong of advertising injury under California law and therefore within the definition of a covered claim under a policy that provided insurance for violations of the right of privacy.
The Aroa court, however, went on to hold that a claim for violation of a right of publicity fell within the exclusion for losses “arising out of the infringement of . . . intellectual property rights,” the same exclusion found in the Policies at issue in this case. The court explained that: “(T]he right of publicity is an intellectual property right, and right of publicity claims would be excluded from coverage under the intellectual properly rights exclusion.” Id. at 788. In a more recent 2015 case, Alterra Excess and Surplus Ins. Co. v. Snyder, 234 Cal.App.4th 1390 (2015), in which the underlying action is quite similar to that brought by the Bikila Family, another California Court of Appeals (First District, Division 2) found that the intellectual properly exclusion applied to claims asserting the unauthorized use of Buckminster Fuller’s name to promote the sale of a series of products. The holdings of these California cases is consistent with a number of Federal cases which have also held that the right to use someone’s name for commercial purposes is an intellectual properly right. See, e.g., ETW Corp. v. Jireh Publ’g, Inc., 332 AF.3d 915, 928 (6th Cir. 2003) (stating that “(t]he right of publicity is an intellectual property right of recent origin which has been defined as the inherent right of every human being to control the commercial use of his or identity”); Allison v. Vintage Sports Plaques, 136 F.3d 1443, 1448 (11th Cir. 1998) (concluding that the common-law right of publicity is an intellectual property right for purposes of the first-sale doctrine); Ji v. Bose Corp., 578 F.Sup.2d 217, 221 (D.Mass. 2008) (holding that while the First Circuit has not addressed the issue, authority from other circuits classifying the right to publicity as an intellectual property right is persuasive). Legal treatises also classify the right to publicity as an intellectual property right. See, e.g., J. Thomas McCarthy, Melville B. Nimmer & the Rights of Publicity: A Tribute, 34 U.C.L.A. L.Rev. 1703, 1712 (1987) (stating that the right of publicity has “matured into a distinctive legal category occupying an important place in the law of intellectual property”); Black’s Law Dictionary 813 (7th ed. 1999) (defining intellectual property as follows: “A category of intangible rights protecting commercially valuable products of the human intellect. The category comprises primarily trademark, copyright, and patent rights, but also includes trade-secret rights, publicity rights, moral rights, and rights against unfair competition”).
In consequence, while this court finds that, under Massachusetts law, an insurance policy providing coverage for violation of the right to privacy does not cover claims for unauthorized commercial use of a person’s name, even if it did, the policy exclusion eliminating coverage for infringement of intellectual property rights would apply.[6]
The use of another’s advertising idea in your “advertisement”
Vibram argues that the “Underlying Complaint is .. . reasonably interpreted as alleging ... that Vibram used the name Bikila as an ‘adversiting idea,’ to ‘associate Vibram’s commercial footwear with Abebe Bikila’s legendary barefoot Olympic feats.’ . . . Vibram’s use . . . connected with products associated with running.” The Insurers, however, do not argue that Vibram has not used Bikila’s name as an advertising idea to promote Vibram’s FiveFinger line of minimalist running gear. Indeed, it is clear that this is exactly what Vibram has done, attempting to associate its line of running shoes with Bikila’s feat of winning the marathon without footwear. Indeed, all four counts of the Underlying Action are predicated on the Bikila Family’s allegation that Vibram employed this advertising idea to sell its products without its authorization and without paying for the right to use the late Abebe Bikila’s personality rights, which the Family now owns.
However, in order for the claims asserted in the Underlying Action to give rise to the Insurers’ duty to defend Vibram, the Underlying Action must be read to assert that Vibram was using the Bikila Family’s advertising idea. Again, there is no specific allegation in the underlying action that the Bikila Family used *569 their family name or “Abebe Bikila” as an advertising idea. The court further notes that Vibram had not directed the court to any case in which a court has held that when a famous person uses her or his name to sponsor something, that person is using his/her own name as an advertising idea. Nonetheless, the court will examine the allegations of the Underlying Complaint to determine if it can be said to assert a claim for misuse of the Bikila Family’s advertising idea.
Vibram contends that a single word can be an “advertising idea.” Again, the Insurers do not dispute that either. Rather, they point out that all but one of the cases cited by Vibram involve trademarks, and the hallmark of trademarks is that they identify a name with particular products or services. Indeed, the case that Vibram primarily relies upon, State Auto Property and Casualty Ins. Co. v. Travelers Indemnity Co. of America, 343 F.3d 249 (4th Cir. 2010) (the Nissan case), makes just this point. In the Nissan case, Nissan Motor Company filed suit against Nissan Computer Company (NCC) for wrongful utilization of the NISSAN trademark. That case spawned coverage litigation between two of NCC’s insurers. The Fourth Circuit identified one of the coverage issues raised by this case as follows: “if Travelers is to be obliged to defend NCC, the NISSAN trademark must qualify as an advertising idea . . .” Id. at 257. It then explained that “a trademark plays an important role in advertising a company’s products. Thus, at the very least, a trademark has the potential to be an advertising idea.” Id. The court went on to hold that: “In this situation, we have a quintessential example of a trademark functioning to advertise a company’s products. The NISSAN mark promotes Nissan’s vehicles to the public ... [as alleged in the underlying action] the mark has become instantly recognizable throughout the United States and the world as a symbol of high-quality automobiles . . . Thus, the NISSAN trademark is an advertising idea.” Id. at 258.[7] It is apparent that the Fourth Circuit’s holding is based on the NISSAN trademark being associated with a particular line of products, such that it serves as a means of advertising those products to potential customers.
The other case on which Vibram principally relies is similar, although it does not involve a trademarked name. American Simmental Ass’n v. Coregis Ins. Co., 282 F.3d 582 (8th Cir. 2002) (the Simmental case) also involved a dispute over a duty to defend a claim in which the plaintiff asserted that the underlying claim against it constituted the “unauthorized taking of advertising ideas.” In the underlying action, American Simmental Association (ASA) was sued by a group of breeders of purebred Simmental cattle for designating and advertising certain bulls as “fullblood” Simmentals, when they had been crossbred with other cattle and therefore were not purebred. The breeders claimed that they used the term “fullblood” to promote their purebred cattle and ASA had misappropriated the term. The Eighth Circuit held that “under a plain and ordinary meaning analysis, [the breeders] alleged an ‘unauthorized taking’ of [the breeders’ ‘advertising idea,’ which ‘infringed’ upon [the breeders’] use of the term ‘fullblood’ and caused injury.” Id. at 587. Here, the term “fullblood” was, for purposes of the duty to defend, an advertising idea promoting a particular product—purebred or “fullblood” Simmental cattle.
Turning to the Underlying Action in the instant case, the Bikila Family does not assert that the name Abebe Bikila has become associated with any particular product or service. To the contrary the Family alleges that some years ago they had a sporting goods store in Ethiopia with the name Bikila on it, a son wrote a book about his father, a Japanese company was once permitted to use his name in an advertisement, and there is a marathon in Adis Ababa that has Abibi Bikila’s name associated with it. The Bikila Family has not used Abebe Bikila’s name to promote or commercialize any particular product or service. It is famous and commercially valuable because of Abebe Bikila’s personal accomplishments, not because the Bikila Family has used it as an advertising idea for a product or service.[8] If, as alleged, the Bikila Family is the owner of this right, it is a classic “personality right” or “right of publicity” not an advertising idea. Vibram has not directed the court to any case where such a right has been found to be an advertising idea.[9]
Infringing upon another’s copyright, trade dress or slogan in your advertisement
As with “advertising idea” the issue presented by this case is not whether Vibram is using the name “Bikila” as a slogan, but rather whether the Bikila Family has alleged that it or Abebe Bikila used the name as a slogan such that the Underlying Action could be read as asserting a claim that falls within this definition of advertising injury. The parties spend much time focused on whether a single word can ever be a slogan. The court need not pause long on that dispute.
In Cincinnati Ins. Co. v. Zen Design Group, Ltd., 329 F.3d 546 (6th Cir. 2003), the Sixth Circuit was called upon to decide if the phrase “the Wearable Light” as used in association with small LED lights constituted a slogan. The court noted that, like the Policies in this case, the policy there at issue did not define “slogan,” but found that the word was “easily defined by resort to common tools, such as dictionaries” and, therefore, was not ambiguous. Id. at 556. It provided the following definition: “ ‘a distinctive cry, phrase, or motto of any party, group manufacturer, or person; catchword or catch phrase.’ Random House Unabridged Dictionary 1800 (2d ed. 1993).” It then held that the use of the phrase “the wearable light” in an advertisement that depicted a picture of the light and the trademarked name “can easily be construed as a catchword *570 or catch phrase used by the manufacturer to promote its product . . . Relying on other common definitions of slogan, ‘the Wearable Light,’ as used in the . . . advertisement also can be considered a brief attention getting phrase used in advertising or promotion.” Id. at 556-57 (internal quotations and citations omitted).
Similarly, in Hugo Boss Fashions, Inc. v. Federal Ins. Co., 252 F.3d 608 (2nd Cir. 2001) (the Boss case), the Second Circuit was called upon to determine the meaning of the term “trademarked slogan,” which was not defined in the insurance policy that was the subject of that coverage litigation. It found that this term was not ambiguous and was not a slogan. It explained the difference between a product name and a slogan used to promote the product: “we interpret the carve-out for ‘trademarked slogans’ as applying only to words or phrases used to promote particular products or product lines. ‘BOSS,’ the house name itself, does not qualify as such a word or phrase.” Id. at 620. Arguably, Vibram might be using Bikila as a slogan to promote its minimalist line of running shoes and apparel, but the Bikila Family did not use it as a catch phrase to promote any product. The Bikila Family does not use Bikila as a slogan when it identifies the name with the memory and achievements of Abebe Bikila. There is no allegation in the Underlying Action that can be read to suggest that the Bikila Family was complaining that it suffered loss because Vibram used a slogan that the Bikila Family used to sell a line of products or services to promote Vibram’s particular products. [10] Their claim is that Vibram used the name Bikila, which is valuable because of the personal achievements of Abebe Bikila, to promote the sale of running gear without authorization in violation of Abebe Bikila’s right to publicity, which the Family now owns.
[[Image here]]
The court concludes that a reasonably informed person would not find that “any [loss alleged in the Underlying Action] fits the expectation of protective insurance reasonably generated by the terms of the policy.” See Billings v. Commerce Ins. Co., 458 Mass. at 201. Vibram believed that there was commercial value in associating the Bikila name with its minimalist FiveFinger running shoes. This is undoubtedly because many runners will be familiar with Abebe Bikila’s accomplishments. Coverage might well exist under the Policies if some other commercial enterprise had previously had the idea of associating the Bikila name with its products, le., used it as an advertising idea or advertising slogan, and filed the Underlying Action. Coverage does not exist for a claim brought by the Bikila Family that alleges that it still owns the rights to the commercial use of the Bikila name. Stated differently, the allegations in the Underlying Action are not “susceptible of an interpretation that states or roughly sketches a claim covered by the policy terms.” Id. at 200.
ORDER
For the foregoing reasons, the plaintiffs’ motion for summary judgment is ALLOWED and the defendant’s motion for summary judgment is DENIED. Final judgment shall enter dismissing the counterclaims and declaring that the plaintiffs do not have a duty to defend the plaintiff in the Underlying Action or indemnify it for any loss sustained in respect thereto.

 Vibram FiveBingers, LLC, an affiliate of Vibram, is an insured under the Maryland policies. For purposes of the pending motions it is not necessary to distinguish between these two entities, and they will be collectively referred to as “Vibram.”

 For simplicity, the court will refer to this coverage simply as “advertising injury.”

 In Billings v. Commerce Ins. Co., 458 Mass. 194, 200 n.10 (2010), the Supreme Judicial Court explained that, as used here, the infrequently employed word “adumbrate” may be understood to mean “roughly sketch.”

 The two cases cited by Vibram in support of this contention do not appear to be on point. See Bogart, LLC v. Ashley Furniture Ind., Inc., 2012 WL 3745833 (M.D.Ga. Aug. 28, 2012) (which actually specifically recognizes the difference between publicify and privacy rights, citing Allison v. Vintage Sports Plaques, 136 F.3d 1443, 1446-47 (11th Cir. 1998)), and Brewer v. Hustler Magazine, Inc., 749 F.2d 527 (9th Cir. 1984).

 The Washington Personality Rights Act states: “Every individual or personality has a property right in the use of his or her name, . . RCW §63.60.010. This, at least, suggests that Washington views the unauthorized use of someone else’s name for commercial purposes as something different than the violation of a right of privacy, i.e., in a manner consistent with Massachusetts law. In any event, Vibram has its principal place of business in Massachusetts, the policies were issued here, and Massachusetts law determines if the facts alleged in the Underlying Action, regardless of how the claims may be labeled, suggest a claim covered by the Policies. See TerraNova, 449 Mass, at 411-12.

 This exclusion has exceptions for claims arising out of the use of another’s advertising idea or slogan. See, supra at 3. Therefore, if coverage applies under either of these definitions of advertising industry, the Insurers are not entitled to this exclusion.

 The Insurers point out that some Circuits have held that a trademark is a label not an advertising idea. See, e.g., Sports Supply Group, Inc. v. Columbia Cas. Co., 335 F.3d 453, 463 (5th Cir. 2003). As Massachusetts courts have not addressed this issue, were this the only basis for finding no coverage, the unsettled nature of the law would likely give rise to a duly to defend, as the possibility of coverage would exist.

 “A barefoot dedication to succeed under any circumstances,” is a personality trait—Abebe Bikila’s heritage—not a product or service.

 Compare 1-2 Gilson on Trademarks §2.03 (2015) (“A celebrity’s name or likeness may itself be a trademark, if it is used by the celebrity to identify the source of products or services and to distinguish them from those of others”).

 In the Boss case, the Second Circuit did find a duty to defend, although nota duty to indemnify. Its ruling was based on its finding that, prior to its decision in the Boss case, there was some uncertainty as to what “trademarked slogan” meant as used in the policy. The court does not find that this uncertainty would have applied to the facts of the instant case where there is no allegation that the Bikila Family associated the name Bikila with any particular product or service. Moreover, the Boss case was decided fifteen years ago.